JAMES T. SMITH, Esq., CA Bar No. 267813
**LAW OFFICE OF JAMES SMITH**
1215 Josephine Street
Berkeley, CA, 94703
Phone Number: (510) 304-5789
Fax Number: (510) 990-8686
Email: jamestyrone@mac.com

Attorney for Plaintiff Porter Smith

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PORTER SMITH,<br><br>           Plaintiff,<br><br>     v.<br><br>CITY OF BERKELEY, a municipal corporation, JAY ELLIOTT, LIONELL DOZIER, individually and in their official capacities as police officers for the City of Berkeley, and DOES 1-20, inclusive, individually, and in their official capacities as police officers and personnel for the City of Berkeley, jointly, and severally.<br><br>           Defendants. | No.  24-cv-04691-JSW<br><br>FIRST AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF FEDERAL CONSTITUTION FIRST AMENDMENT RIGHT UNDER COLOR OF STATE LAW (42 U.S.C. § 1983); VIOLATION OF FEDERAL CONSTITUTION FOURTH AMENDMENT RIGHT UNDER COLOR OF STATE LAW (42 U.S.C. § 1983); *MONELL* LIABILITY FOR FAILURE TO TRAIN; and CALIFORNIA STATE LAW CLAIMS FOR VIOLATION OF BANE ACT (CAL. CIV. CODE § 52.1), ASSAULT, BATTERY, AND FALSE IMPRISONMENT<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.      This case arises out of City of Berkeley police officers' actions taken under color of state law against Porter Smith in Berkeley, California, on April 26, 2023. Berkeley police officers

chased, arrested, and imprisoned Mr. Smith for orally expressing his opinions of police and policing to one of them.

2. This action seeks compensatory and punitive damages from Defendants for violations of California law and for violations of Plaintiff's rights under the United States Constitution, in connection with Defendants' pursuit, arrest, and imprisonment of Plaintiff.

## JURISDICTION

3. This action is brought pursuant to Title 42 United States Code § 1983 and the First, Fourth, and Fourteenth amendments to the United States Constitution; California Civil Code § 52.1; California common law; and related California statutes and regulations.

4. Because this case involves a federal question under the Constitution and laws of the United States, this court has original jurisdiction pursuant to 28 U.S.C. § 1331. It also has jurisdiction in this case under 28 U.S.C. § 1343, to adjudicate a claim involving the deprivation a constitutional right.

5. The events, acts, and omissions that form the basis of this complaint all occurred in the City of Berkeley, California, within this Court's territorial jurisdiction. Under 28 U.S.C. § 1391(b)(2), venue in this Court is therefore proper.

6. Plaintiff's claims brought under California law arise out of the same set of facts as his federal claims, forming part of the same case or controversy under Article III of the United States Constitution. This Court therefore has supplemental jurisdiction over Plaintiff's California state law claims pursuant to 28 U.S.C. § 1367.

## DIVISIONAL ASSIGNMENT

7. As the events, acts, and omissions that form the basis of this complaint all occurred in the City of Berkeley, within the County of Alameda, California, under Civil L.R. 3-2(c), this case is properly assigned to the Oakland or San Francisco Division of this Court.

## PARTIES

8. Plaintiff Porter Smith (hereinafter Plaintiff, or Mr. Smith) has been at all relevant times and remains a resident of Berkeley, California. He is a United States citizen.

9. Defendant JAY ELLIOTT at all material times was employed as a sworn police officer by Defendant City of Berkeley ("CITY"), and throughout the sequence of events alleged in this complaint was acting in the course and scope of his employment, exercising authority under color of state law. He is being sued in his individual capacity under 42 U.S.C. § 1983, and in his individual and official capacities as a police officer under Plaintiff's state law claims.

10. Defendant LIONELL DOZIER at all material times was employed as a sworn police officer by Defendant CITY, and throughout the sequence of events alleged in this complaint was acting in the course and scope of his employment, exercising authority under color of state law. He is being sued in his individual capacity under 42 U.S.C. § 1983, and in his individual and official capacities as a police officer under Plaintiff's state law claims.

11. Defendant DOEs 1 through 20, inclusive, at all material times were employed by Defendant CITY, and were acting in the course of and within the scope of their employment to exercise authority under color of state law, as sworn police officers, supervisors, public administrators, or police support personnel. Defendant DOEs 1-20 are being sued in their individual capacities under 42 U.S.C. § 1983, and in their individual and official capacities as a police officers, supervisors, public administrators, or police support personnel under Plaintiff's state law claims.

12. Defendant City of Berkeley ("CITY") is an incorporated public entity under the laws of California. At all times mentioned herein, Defendant CITY has maintained authority to adopt and enforce policies, prescribe rules, and oversee practices affecting the operation of the City of Berkeley Police Department and its personnel. At all relevant times, Defendant CITY was the employer of Defendants JAY ELLIOTT, LIONELL DOZIER, and DOES 1 through 20, individually and as police officers, supervisors, public administrators, and support personnel.

13. Defendant CITY is vicariously liable under principle of respondeat superior for the California state law violations alleged against the individual Defendants. Defendant CITY is liable under 42 U.S.C. § 1983 for the policies, practices, and customs followed by the Berkeley Police Department, and for those deficiencies in its training of Berkeley police officers, that resulted in the violation of Plaintiff's constitutional rights, and injuries stemming therefrom, as alleged in this complaint.

14. Plaintiff alleges that each of the Defendants was responsible in some measure for the events hereinafter described, and wrongfully and proximately caused injuries and damages to Plaintiff. Plaintiff further alleges that one or more Defendants were at all material times responsible for the hiring, training, supervision, and discipline of other Defendants.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

15. To subject a California government entity to tort liability under California law, a party must satisfy the requirements of the California Tort Claims Act, California Government Code § 900 et seq. The Act mandates that, before suing a California government entity for tort damages, a party must submit an administrative claim for damages to that entity, and have that claim addressed. If the claim is denied, the claimant may sue the entity to seek damages, within six months of the issuance of the denial.

16. As the liability the City of Berkeley in this matter is integral to all of Plaintiff's causes of action under California law, Plaintiff first sought relief from Defendant CITY through the filing of an administrative claim, as a condition to the filing of a civil complaint for relief from all defendants for all claims, both state and federal, arising from the same set of facts.

17. Accordingly, Plaintiff timely filed a "Claim Against the City of Berkeley" on October 15, 2023, to which the city's claims administrator assigned the identifier 0171BC2024. Defendant CITY rejected this claim on December 8, 2023. Plaintiff has therefore exhausted all administrative remedies for subjecting Defendant CITY to liability for claims made in this complaint, pursuant to California law.

## FACTUAL ALLEGATIONS

18. On April 26, 2023, about 12:30 pm, Plaintiff Porter Smith took a lunch break from his work tutoring math students at Berkeley City College (BCC), located at 2050 Center Street in Berkeley, California. It was a warm day, so Mr. Smith decided to walk to the nearby Endless Summer Sweets restaurant, a few blocks south of BCC, at 2358 Shattuck Avenue. His route took him east out the main door from BCC to Shattuck, then south a few blocks to his destination. Appropriate to the weather, Mr. Smith was lightly dressed, in a t-shirt. He carried only his cell phone and a set of small, wired earphones with him.

19.     Shortly after 1 pm, Mr. Smith began his return from Endless Summer Sweets to BCC. After ambling north along Shattuck for a block, he decided to make a loop out of his lunchtime walk, and so turned west along the north side of Bancroft Way, heading toward Milvia Street, where he could turn north again toward BCC.

20.     About 90 feet short of Milvia, Mr. Smith paused for a moment, to review a message on his cell phone. From that vantage, he took notice of the presence of a marked Berkeley Police Department vehicle. The vehicle was parked at the transit boarding island on the west side of Milvia. It was facing south, in the island's red zone, about 30 feet north of the centerline of Bancroft. Its engine was inactive. A Berkeley police officer, Defendant Jay Elliott, sat alone inside the vehicle, at the driver's wheel. He was conversing through the vehicle's open front passenger window with an unidentified woman, who was standing on the transit boarding island.

21.     In the midst of reviewing his message, Mr. Smith glanced up from his phone to see the unidentified woman disengage from Officer Elliott. She stepped from the island to the sidewalk, and walked off at a brisk pace, northbound on Milvia. A moment later, Mr. Smith finished reviewing his message, pocketed his phone, and resumed his own walk, back to BCC, proceeding westbound on Bancroft toward Milvia.

22.     As he crossed Milvia, Mr. Smith saw the unidentified woman approaching Kittredge Street, about 300 feet away. She turned left there, into a doorway to Berkeley High School. The school campus borders Milvia for the entirety of its length, from Allston Way at the campus's north end to the southern terminus of the campus at Channing Way. Mr. Smith saw no other persons in the immediate area, either along the path he had been traveling down Bancroft, in the school parking lot at the intersection of Bancroft with Milvia, or along Milvia Street itself. Nor did he see anyone before him, across Milvia, where Bancroft meets the Berkeley High campus at what the school identifies as Gate 5. The school's lunch period had ended that day at 12:21 pm. Now, a little after 1 pm, no student or school activity was evident within sight of the transit boarding island as Mr. Smith beheld it.

23.     Upon reaching the west side of Milvia, Mr. Smith turned north toward BCC. Behind him and to his left was Gate 5. Immediately to his left was the southern section of the Berkeley

High School E building, stretching north from him along Milvia Street for about 100 feet. The E building is a massive concrete structure, about 40 feet tall, with walls more than 18 inches thick. The southern section of the building contains only a single level, occupied by the school swimming pool, above which there is open space all the way to the building's ceiling. The eastern wall of the E building's southern section, bordering Milvia, features four uniform sets of vertically oriented double-glazed windows. Each set of windows stretches from a base height of about 7.5 feet above the ground to a peak height of 30 feet or so.

24.     Immediately to Mr. Smith's right was the parked police vehicle, with its driver, Officer Elliott, seated idly within, and with its front passenger window still open. The officer's availability and proximity there suddenly struck Mr. Smith as providing occasion for him to express a few strongly held opinions on policing, directly to one of its practitioners.

25.     Mr. Smith stepped to the transit boarding island and stopped. He stood opposite the open front passenger window of the vehicle, facing it from about three feet away. His hands were open and empty. He addressed Officer Elliott, who was still in the driver's seat. At no more than a conversational volume, Mr. Smith said to him, firmly, "Fuck you, you're a fucking bitch, I fucking hate police," or words to that effect. He spoke only, and made no gestures toward the officer other than to point an index finger to punctuate his opinions.

26.     In reply, Officer Elliott began to exit his vehicle, while ordering Mr. Smith to "Stop" and "Stay right there." He said nothing else. Mr. Smith, worried that Officer Elliott might be approaching to attempt an unlawful, retaliatory arrest in reaction to his speech, began moving away, south down Milvia Street. As he retreated, Mr. Smith asked aloud, "Why should I stop? What crime do you reasonably suspect me of committing?" Now outside his vehicle and charging toward Mr. Smith, Officer Elliott responded by saying, "Stop, don't run now, why are you running?"

27.     Officer Elliott did not answer Mr. Smith's questions about reasonable suspicion. He did not ask Mr. Smith to leave the area. He did not accuse Mr. Smith of any criminal action or nascent criminal action; mention any investigative purpose; propose to inform Mr. Smith of any law enforcement objective he might be pursuing; or suggest that Mr. Smith posed a risk to his safety or to anyone's safety, anywhere. Officer Elliott did not articulate any justification whatever for issuing

orders to, detaining, or even questioning Mr. Smith. Elliott's response to Mr. Smith's questions was not to explain his objectives, but to initiate a hot pursuit of Mr. Smith on foot.

28.     Mr. Smith had approached Officer Elliott believing that his speech alone—addressed to Elliott alone and audible only to the two of them—, could present no legal basis for his detention. Now, in immediate fear for his physical safety from the charging Officer Elliott, Mr. Smith hastened his pace southward down Milvia, breaking into a run. Having confronted a police officer with opinions adverse to the conduct of his chosen profession, Mr. Smith was beset with concerns over a larger police reaction.

29.     That reaction was at hand. Officer Elliott quickly joined with an unidentified fellow Berkeley police officer (Defendant DOE 1) to continue pursuing Mr. Smith in a Berkeley police vehicle, from which the two officers shouted at Mr. Smith. Believing himself to be the target of a retaliatory police action in progress, Mr. Smith was terrified of what his pursuers would do to him if they caught up to him. Amidst the shouting of Officers Elliott and DOE 1, Mr. Smith heard multiple approaching sirens from what he concluded must be other police vehicles joining the chase. The prospect of being surrounded by a group of agitated police officers quickly persuaded Mr. Smith to disregard the officers' demand to stop. He continued running.

30.     The chase proceeded through the blocks of central Berkeley, with Mr. Smith shifting directions as his fear dictated. As he circled through the neighborhood, he saw other police vehicles headed his way. Aware that the contingent of officers chasing him was continuing to expand, his concern about police retaliation for his speech to Officer Elliott only intensified. He sprinted up the north side of Dwight Way, heading east, back toward Milvia, approaching the grounds of the Alta Bates Summit Medical Center, Herrick Campus.

31.     Just as he finished crossing Milvia, Mr. Smith was suddenly caught from behind by an unidentified Berkeley police officer (Defendant DOE 2) riding a bicycle. From his bike, Officer DOE 2 grabbed Mr. Smith by his forehead and jerked him backward to the ground, where several more unidentified officers (Defendant DOEs 3, 4, 5, 6) set themselves upon him. This cohort of police forcibly restrained Mr. Smith, handcuffed him, searched him, and placed him into the rear

seat of a police vehicle, all without any mention of the cause of his pursuit or arrest or any circumstances related thereto.

32.     In the police vehicle, Mr. Smith discovered Berkeley police officer Defendant DOE 7, who appeared to be performing a supervisory role. Mr. Smith quickly asked Officer DOE 7 about the cause of his arrest. She told him he was being arrested for "disrupting a school campus" and "resisting arrest." Officer DOE 7 asked Mr. Smith his name, and whether he was on probation or parole, or was subject to any bail conditions. Mr. Smith correctly identified himself to Officer DOE 7, who asked him no further questions. As Mr. Smith watched, Officer DOE 7 consulted her vehicle's computer to positively identify him and to verify his status with respect to his answers to her questions about probation, parole, and bail conditions.

33.     After a few moments, Officer DOE 7 opened the rear passenger window of the vehicle, through which Mr. Smith beheld Officer Elliott, standing just outside. She asked Officer Elliott, "Is this him?" Officer Elliott answered, "Yes," and smiled.

34.     Neither Officer Elliott nor Officer DOE 7 communicated any further with Mr. Smith at the scene. They did not ask him whether he had been on or near the Berkeley High School campus at any time in the recent past. They did not ask him whether he had received any warning at any time from anyone to remain off the campus for any reason. They did not ask him what business he might have had walking Milvia Street past Berkeley High School. They did not articulate any specific facts indicating Mr. Smith had presented a threat to anyone's safety at any time prior to or concurrent with his arrest, that he was about to destroy evidence of a crime, or that he had been impeding or was the subject of any emergency response or community caretaking function the officers had been executing. Neither they nor any other officers stated to Mr. Smith what suspicion they might have had of him to justify having pursued him, nor did they mention any probable cause to validate his arrest.

35.     From the scene of the arrest, Officer DOE 7 drove Mr. Smith to the Berkeley Public Safety facility at 2100 Martin Luther King Jr Way. She said he would be booked, processed, and confined in the jail there, pending further disposition. Upon arrival at the facility, while still in the back seat of the police car, Mr. Smith was overcome by the physical toll of the chase and the

injuries he had sustained over the course of it and during his arrest. He felt the sting of lacerations to his limbs, and the soreness of emerging bruises. He was shaking and disoriented, in a state of fear and dismay. As Officer DOE 7 parked the car at the facility's arrestee intake portal on the back side of the building, Mr. Smith said to her, "I'm pretty sick," to which she responded, "Well, when police tell you to stop, you should stop." He then vomited in the back of the police car, whereupon Officer DOE 7 said to him, "So what did we learn today? Maybe you shouldn't run from police."

36.     Other officers emerged from the building to meet the car. While removing Mr. Smith from the back seat, one of them asked Officer DOE 7 about Mr. Smith's vomitus in the car, "Oh, should I clean that up?" She answered, "No, we'll have Crime Scene do it," referring to the Berkeley Police Department Crime Scene Unit, which is charged with collecting and analyzing evidence, and processing criminal suspects.

37.     Once inside the building, as they proceeded to the booking desk, Officer DOE 7 asked Mr. Smith, "So you were the one swearing out my officer? Seriously? He's such a nice guy. The other officers, I understand, but him? I don't get it."

38.     Just then, Mr. Smith noticed Officer Geoffrey Mitchell in the booking area. Mr. Smith recognized Mitchell as a former presence on the Berkeley High School campus, where Mitchell had served as a School Resource Officer (SRO)—an armed and uniformed police officer specially assigned to address criminality on the school campus.

39.     Mr. Smith had had occasion in recent years, during his time as a Berkeley High student, to interact with Officer Mitchell, and to have observed others interacting with Mitchell and other Berkeley police officers, including Lionell Dozier, in their roles as SROs. In those interactions, on the school campus and on the bordering streets, Mr. Smith had witnessed students and non-students alike expressing profane opinions of police and policing directly to Mitchell, Dozier, and other officers—loudly, vigorously, at very close range, and in the midst of students, parents, faculty, and others actively conducting school activities during school hours. He recalled having so spoken himself to Mitchell and Dozier in such circumstances. He also recalled that neither Mitchell, Dozier, nor any of their fellow officers had moved to question, detain, command,

FIRST AMENDED COMPLAINT FOR DAMAGES                    No.  24-cv-04691-JSW

obstruct, pursue, or arrest any of those who thus spoke to them. In every one of these many circumstances, the officers simply disregarded the critical speech directed to them.

40.     As he awaited further action in the booking process with Officer DOE 7, Mr. Smith engaged Officer Mitchell in a brief conversation. Seeking clarity on the basis for his being charged with disrupting a school under Penal Code section 626.8, Mr. Smith wondered aloud to Mitchell how a person could be accused of disrupting a school without actually entering the campus. Mitchell answered, "Well, technically, you don't have to be on a school campus for 626.8," and then wandered off.

41.     The booking process continued. Mr. Smith's picture and fingerprints were taken to form an arrest record, and he was booked into custody. About 2:20 pm, Mr. Smith was given access to a phone, which he used to call his family. He was immediately thereafter confined in a cell at the jail on the premises, to await disposition.

42.     Responding to Mr. Smith's phone call, his mother, Erica Riggs, proceeded to the jail, meaning to provide him with prescription medication. Ms. Riggs reached the jail about 2:45 pm. Once there, she approached the desk officer in the building lobby and communicated her intention to deliver the medication. The lobby desk officer told Ms. Riggs that she could proceed to the jail intake area to discuss the matter with the officer on duty there.

43.     At the intake area, Ms. Riggs pressed a summons button, to which the intake officer (Defendant Officer DOE 8) responded, whereupon Ms. Riggs gave the medication to Officer DOE 8 for delivery to Mr. Smith, who never received it. She asked Officer DOE 8, "So, what's going to happen? Is he going to be released, or what?" Officer DOE 8 said, "I'm not sure why it's taking so long. They usually would have signed off on something like this. If they don't, soon, they'll have to take him to Santa Rita." Ms. Riggs said, "Santa Rita! If he goes there, he may never come back!" Officer DOE 8 answered, "Oh yeah, I know. He shouldn't go there. It's not a good thing." Ms. Riggs asked, "Is there any way I can talk to the arresting officer?" Officer DOE 8 answered, "No, he's out in the field. But you may be able to ask at the front desk."

44.     Ms. Riggs returned to the building lobby, where she asked the lobby desk officer whether she could speak with Mr. Smith's arresting officer. The desk officer told Ms. Riggs she

could use the lobby phone to call the department dispatcher, who could then contact the arresting officer for further communication. Ms. Riggs used this phone to call the dispatcher, to whom she relayed her request for communication with Mr. Smith's arresting officer. The dispatcher told her that a call would be made to the officer, and that she should stand by in the lobby area for a possible response.

45.     About 15 minutes later, Officer DOE 9 entered the lobby area and identified himself to Ms. Riggs as "the arresting officer of Porter Smith." With Mr. Smith's imminent transfer to Santa Rita jail pending, Ms. Riggs asked Officer DOE 9, "Officer, is there any way you can sign off on his release? He hasn't been feeling well. He is on medication, and he needs to take it. Is there any way you can release him? It's not going to be good to go to Santa Rita." Officer DOE 9 answered, "Yes ma'am, we can do this for you." Officer DOE 9 gave no indication that Mr. Smith would otherwise have been released before being transferred to Santa Rita Jail. Ms. Riggs said, "Thank you very much, I really appreciate it." Officer DOE 9 then departed. Ms. Riggs returned to the lobby desk to ask when Mr. Smith would be released, and was told it would be several hours yet.

46.     About 7:15 pm, an unidentified officer (Defendant Officer DOE 10) escorted Mr. Smith from his jail cell to the jail intake desk. There, Officer DOE 10 presented him a citation, and said: "We're going to release you on a promise to appear. Sign this citation. It gives you a court date. Signing it does not admit guilt, but you have to sign this in order to be released, so that we know you'll appear in court."

47.     The citation, number 319171, provided a case number of 23-20071, a CEN of 3378464 and a PFN of BNP340, and it specified that the violations it charged were "not committed in my presence, declared on information and belief." The citation was signed by Jay Elliott, Serial No. 439, as "Arresting or Citing Officer," and by "Dozier #119" as "Arresting Officer, if different from citing Officer." The citation stated misdemeanor charges for violations of California Penal Code sections 626.8(a)(1) and 148(a)(1).

48.     Mr. Smith signed the citation, which committed him to a court appearance date of 5/26/2023 in Department 108 at the Wiley W. Manuel courthouse in Oakland, California. Upon signing, Mr. Smith was released from the Berkeley jail. In all, from the time of his arrest on Dwight

Way, about 1:45 pm, he had spent 5.5 hours in police custody, for nearly 5 hours of which he was confined alone in a jail cell—all for briefly expressing his opinions on police and policing directly to a police officer.

49. Following his arrest and confinement, Mr. Smith received no further communication regarding his case, from any source. At 2 pm on 5/26/2023, he appeared as his citation had directed, at Department 108 of the Wiley W. Manuel courthouse. There, he sat through more than two hours of hearings, until court personnel became curious about his presence, and asked him to share his case information with them to determine its status. After about 15 minutes of investigation involving the court clerk and bailiff, the bailiff approached Mr. Smith and informed him that, for purposes of addressing his presence in court that day, his case had been tentatively dismissed, "in the interests of justice." The bailiff said that the ultimate disposition of the matter lay with the district attorney's office, and that Mr. Smith should verify the case's status with that office sometime over the next few months, to be sure of its resolution.

50. Having obtained no certainty at his court appearance concerning his continued criminal jeopardy in the matter, Mr. Smith sought information about the status of his case elsewhere. He began with the Berkeley Police Department, by submitting a formal written request to the department's Records section for reports documenting his arrest. The department responded that it could not release any such information to him, as the case remained "under investigation."

51. On November 13, 2023, the Berkeley Police Department sent Mr. Smith a "BERKELEY PD-DETENTION CERTIFICATE," which he received on November 15, 2023. The certificate announced that its purpose was to satisfy the dictates of California Penal Code section 851.6, which requires a law enforcement agency to formally signify to an uncharged custodial arrestee that the record of his arrest has been transformed by operation of law into a record of detention only.

52. The certificate identified California Penal Code sections 849 and 849.5 as the two possible bases for triggering the department's obligation to issue a certificate to Mr. Smith under section 851.6, but did not expressly identify which of these two statutes applied in Mr. Smith's case.

## **DAMAGES**

53.     Defendants' violations of Plaintiff's clearly established legal rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution, and the laws of the State of California, caused Plaintiff physical injury and prolonged emotional distress.

54.     Plaintiff has found it necessary to engage private counsel to vindicate his legal rights, for which he seeks compensatory damages. If he prevails on any cause of action brought under 42 U.S.C. § 1983, Plaintiff is entitled to an award of costs, including attorney's fees, pursuant to 42 U.S.C. § 1988. If Plaintiff prevails on his cause of action under California Civil Code § 52.1, he is entitled to attorney's fees under that statute. Plaintiff is also entitled to punitive damages, as Defendants acted against him maliciously, oppressively, and in reckless disregard of his constitutional rights.

## **FIRST CAUSE OF ACTION**

### **VIOLATION OF FIRST AMENDMENT RIGHT TO FREE SPEECH**
### **(42 U.S.C. § 1983)**
### **(PLAINTIFF AGAINST DEFENDANTS ELLIOTT, DOZIER, DOEs 1 through 20, inclusive)**

55.     Plaintiff realleges and incorporates by reference paragraphs 1 through 54 of this complaint.

56.     The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides in relevant part: "Congress shall make no law…abridging the freedom of speech."

57.     Defendants acted to deprive Plaintiff of his right to free speech by exercising authority under state law to retaliate against him for exercising that right in addressing Officer Elliott. Defendants' actions in any phase of their retaliation against Mr. Smith—pursuit, arrest, imprisonment, or citation—would likely deter a person of ordinary firmness from exercising his right to free speech.

58.     As described above, Defendant Elliott moved against Mr. Smith and summoned other officers to join him, in reaction to and retaliation for Mr. Smith's having addressed him with constitutionally protected speech, and for no other articulated or conceivable reason.

59. Defendants lacked reasonable suspicion to attempt to detain Mr. Smith, since he did not evince any suspicious behavior by walking a public street and approaching a police officer to express his opinions. That Mr. Smith soon thereafter ran from police pursuit did not itself serve to support a reasonable suspicion of criminality on his part. Smith had not reacted spontaneously to police presence by fleeing potential contact with officers. He had instead initiated calm, controlled, direct contact with Officer Elliott, but then had to abruptly terminate that contact as he attempted to avoid police retaliation undertaken under color of law.

60. Defendants also lacked probable cause to chase, arrest, or imprison Mr. Smith, and did not describe any such cause to Mr. Smith. Nevertheless, Defendants attempted to justify their retaliation against Mr. Smith by citing him for violating California Penal Code sections 626.8(a)(1) and 148(a)(1).

61. California Penal Code § 626.8 states in relevant part: "(a) Any person who comes…upon any school ground…or public way adjacent thereto, without lawful business thereon, and whose presence or acts interfere with the peaceful conduct of the activities of the school or disrupt the school or its pupils or school activities, is guilty of a misdemeanor if he…: (1) Remains there after being asked to leave by…a city police officer…"

62. Probable cause to arrest Mr. Smith for violating § 626.8 would therefore have required fulfillment of at least four essential elements, wholly absent in the circumstances surrounding his encounter with Officer Elliott: (1) that Mr. Smith have had no lawful business on the street where he encountered Officer Elliott; (2) that Mr. Smith's presence or acts have been interfering with the peaceful conduct of the activities of the school, or disrupting the school, its pupils, or school activities; (3) that Mr. Smith have been asked to leave the street; and (4) that Mr. Smith have remained on the street after having been asked to leave.

63. As the preceding factual allegations recount, Mr. Smith: (1) was about his lawful business walking a city street on his return to work at BCC; (2) did not see, let alone make contact with, any school activities, students, or personnel whom he could have interfered with or disrupted; (3) was not asked to leave the street by anyone; and (4) far from remaining on the street, left the area immediately after the only human contact he made there that day, with Officer Elliott. More

than this, Mr. Smith had not been identified or documented as having contacted, interfered with, or disrupted any Berkeley High School activities, students, pupils, or personnel at any time preceding his encounter with Officer Elliott.

64.     Defendants also lacked probable cause to arrest Mr. Smith for resisting arrest under California Penal Code § 148(a)(1), which states in relevant part: "Every person who willfully resists, delays, or obstructs any…peace officer…in the discharge or attempt to discharge any duty of his or her office or employment…shall be punished by a fine…or by imprisonment in a county jail…or by both that fine and imprisonment." Because there was no probable cause to arrest Mr. Smith for violation of Penal Code section 626.8(a)(1), Defendants were discharging no lawful duty in pursuing him. Simply running from police, who are giving chase but in so doing are not discharging a lawful duty, cannot constitute resisting arrest under section 148(a)(1) (People v. Curtis, 70 Cal. 2d 347).

65.     Nor could officers have identified any alternative probable cause to justify their treatment of Mr. Smith, as he had not engaged in, or given any sign of engaging in, criminal conduct. All he had done was speak, in constitutionally protected terms, without a hint of threat in his presentation, alone to Officer Elliott. What Mr. Smith did was exercise his right of free speech in a normal tone of voice to a single police officer. Retaliation against him for exercising that right immediately followed.

66.     Even had there been some probable cause arising from his speech that could have provided officers a basis to arrest Mr. Smith, Berkeley police had demonstrated, as described in Mr. Smith's observations and experiences recounted in the factual allegations above, that they did not normally arrest persons engaged in such speech to officers on or about school premises.

67.     Moreover, according to news reports, Berkeley police are accustomed, as a general matter, to accepting critical speech without responding. In 2018, former Berkeley police officer Jeff Shannon, a 13-year veteran of the department and a specialist in verbal de-escalation, was quoted in a Berkeleyside article as saying, "People say, 'Fuck the police,' and that's fine." He went on to describe such criticism as a commonplace feature of police work: "Even on something innocuous, like a traffic stop, citizens walk up not knowing anything about what's going on and they start

making accusations." (Emilie Raguso, As staffing crisis continues for Berkeley police, officers who left reveal why, Berkeleyside (December 20, 2018), https://www.berkeleyside.org/2018/12/20/as-staffing-crisis-continues-for-berkeley-police-officers-who-left-reveal-why). In the same article, former Berkeley police officer Patty Delaluna, a 22-year veteran of the Berkeley force, describes "being yelled at through a bullhorn for 30 minutes being told "I should die because I'm a 'pig'," and further recalls an incident in which she was "talking with a witness once, in the middle of a robbery investigation, when someone came up to interrupt her and call her "a cunt." (Id.)

## SECOND CAUSE OF ACTION

### UNREASONABLE SEIZURE OF PERSON UNDER FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)
### (PLAINTIFF AGAINST DEFENDANTS ELLIOTT, AND DOES 1 THROUGH 7, INCLUSIVE)

68.     Plaintiff realleges and incorporates by reference paragraphs 1 through 67 of this complaint.

69.     The Fourth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

70.     Defendants Elliott and DOEs 1-6 violated Mr. Smith's constitutional right to be free from unreasonable seizure by seizing his person in an arrest unsupported by probable cause. This seizure was per se unreasonable, as it was made without a warrant, exigent circumstances, or statutory authority.

71.     Defendants executed the seizure of Mr. Smith under color of state law, citing him for violations of California Penal Code sections 626.8(a)(1) and 148(a)(1). As described above, Defendants initiated a pursuit of Mr. Smith without any legal basis under these statutes to detain him. They then surrounded and tackled Mr. Smith to effect their seizure, whereafter they imprisoned him. The Defendants' unlawful seizure of his person caused Mr. Smith physical injury and severe and lingering emotional distress.

### THIRD CAUSE OF ACTION
### VIOLATION OF 42 U.S.C. § 1983,
### SUPERVISOR LIABILITY IN INDIVIDUAL CAPACITY FOR ACTS OF SUBORDINATES
### (PLAINTIFF AGAINST DEFENDANTS DOZIER AND DOES 7 THROUGH 20, INCLUSIVE)

72.     Plaintiff hereby repeats realleges and incorporates by reference paragraphs 1 through 71 of this complaint.

73.     Before arresting, citing, and imprisoning Mr. Smith, and for several hours thereafter, Defendant DOE 7 and other supervisory personnel with whom she had contact (Defendant Officer Dozier, and Defendant DOEs 8-20), had ample opportunity to evaluate Officer Elliott's bases for detaining Mr. Smith, and to determine whether there had been any foundation for charging him with disrupting a school under Penal Code section 626.8(a)(1), solely because he had spoken alone and only in the hearing of Officer Elliott. However, DOE 7 and Dozier not only neglected to conduct such an evaluation, but instead ratified Officer Elliott's actions.

74.     By approving and furthering Officer Elliot's wrongful conduct, rather than correcting it, DOE 7, Dozier, and DOEs 8-20 contributed to the violation of Mr. Smith's constitutional right to be free from unreasonable seizure.

### FOURTH CAUSE OF ACTION

### FAILURE TO TRAIN
### (42 U.S.C. § 1983)
### (PLAINTIFF AGAINST DEFENDANT CITY)

75.     Plaintiff realleges and incorporates by reference paragraphs 1 through 74 of this complaint.

76.     As recounted above, Defendants Elliott, Dozier, and DOEs 1-20 acted in concert against Mr. Smith under color of state law, first to retaliate against him for exercising his right to free speech, and then to seize and hold him unreasonably for it.

77.     Despite consistent experience with and media reports of adverse and even hostile speech directed toward police throughout the jurisdiction, as described above, CITY did not implement training for Berkeley Police officers to understand the limits of their power to react to

FIRST AMENDED COMPLAINT FOR DAMAGES          No. 24-cv-04691-JSW

such speech experienced in everyday discourse, and to observe the imperative for using law

properly under any necessity to respond to such speech.

78. The City of Berkeley Police Department Law Enforcement Services Manual

(BPDLESM), dated 4/11/2022, contains guidance for police officers in conducting themselves

across a range of circumstances, in accordance with both California and federal statutes and court

decisions.

(https://berkeleyca.gov/sites/default/files/documents/RELEASE_20220613_T124840_Berkeley_PD

_Policy_Manual.pdf%206%2029%2022.pdf).

79. The manual specifically cites to a variety of precedents, such as Martin v. City of

Boise, 902 F.3d 1031 (9th Cir. 2018) and Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865 (1989)

to provide the legal backdrop for its guidance in a variety of situations officers may encounter,

including recognizing and respecting protected speech. However, the guidance on responding to

protected speech, articulated in policies 400, 428, and 429 (Id.), is limited to the exercise of free

speech rights in mass gatherings, where crowd safety concerns predominate, and officers are put, as

the manual says, to balancing the exercise of free speech against those concerns.

80. That officers encounter hostile speech in their exchanges with individuals more often

than in mass gatherings is obvious, given that there are far more police engagements with

individuals alone than there are with mass gatherings. However, despite officers' reported

experiences with offensive speech in individual encounters over a period of years, the BPDLESM is

bereft of guidance on respecting freedom of speech in such encounters.

81. While there is decisional law holding that swearing at police is protected speech

under the First Amendment (see United States v. Poocha, 259 F.3d 1077), the BPDLESM neither

provides citations to this law to help officers recognize the boundaries of protected speech, nor does

it define a policy for officers to follow when treating with such protected speech in individual

encounters.

82. Coupled with officers' frequent encounters with spontaneous insults and profanity as

reported by local news media, the BPDLESM's omission suggests a known and obvious

consequence of failing to train officers adequately in respecting and responding to such speech. The

failure to include specific court decisions clearly articulating that swearing at police is legally protected speech further underscores this point.

83.     By failing to train its officers in what to properly recognize as free speech under applicable California and federal laws, in how to observe and enforce these laws, and in how to refrain from acting in a retaliatory fashion under of color of law in response to agitation by critical speech, the City of Berkeley Police Department played a substantial part in depriving Mr. Smith of his constitutional rights to free speech and freedom from seizure.

84.     CITY was therefore deliberately indifferent to the known and obvious consequences of its failure to adequately train its officers.

### FIFTH CAUSE OF ACTION
### VIOLATION OF CALIFORNIA CIVIL CODE § 52.1 (BANE ACT),
### (PLAINTIFF AGAINST ALL DEFENDANTS)

85.     Plaintiff realleges and incorporates by reference paragraphs 1 through 84 of this complaint.

86.     California Civil Code § 52.1 authorizes suit against anyone who by threats, intimidation, or coercion attempts to interfere with, or who does interfere with, another's exercise or enjoyment of rights secured by the United States Constitution. California Civil Code § 52(a) allows for damages up to three times actual damages, with a minimum of $4,000 for each violation of § 52.1.

87.     Defendants acted violently against Mr. Smith in retaliation for his having exercised his constitutional rights of free speech. Defendants organized and executed a pursuit, violent takedown, custodial arrest, booking, and imprisonment of Mr. Smith in retaliation for his having exercised his constitutional right to free speech.

88.     As described in the factual allegations above, Defendants Elliott, and DOES 1-6 organized and executed a retaliatory pursuit of Mr. Smith for exercising his right to free speech under the First Amendment to the United States Constitution. This pursuit, beginning with Officer Elliott but quickly expanding to additional Berkeley police officers, police cars and bikes, came without even so much as a reasonable suspicion of Mr. Smith's involvement in any criminal

activity. Comprising a bevy of armed police converging on Mr. Smith from multiple directions, the pursuit constituted a concerted effort to deliberately intimidate him, giving him cause to believe that violence against him was impending for his having done nothing more than to spontaneously express his opinions of police and policing, in a controlled and isolated fashion, to a police officer. Mr. Smith was shaken and panicked at the initial approach of Officer Elliott, so much so that he fled the scene on foot, only to have Officer Elliott follow and recruit others to the chase, intensifying Mr. Smith's apprehensions of imminent violence as he fled.

89. Putting Mr. Smith in fear for his safety through the intimidation of pursuit was only the first of many consequences of the Defendants' actions against him. After completing the chase, Defendants DOEs 2-8 continued their retaliation against and intimidation of Mr. Smith by subduing him in a violent takedown, arresting him without a warrant or probable cause, booking him, imprisoning him, and citing him for violating sections 626.8(a)(1) and 148(a)(1) of the California Penal Code. In so doing, Defendants not only continued to intimidate Mr. Smith for exercising his right to free speech, but also intentionally interfered with his right to remain free from unreasonable seizure under the Fourth Amendment to the United States Constitution, causing him further physical injury and continuing emotional distress.

90. Under California Government Code § 815.2(a), Defendant CITY is vicariously liable for damages to Mr. Smith for injuries alleged herein, incurred as a proximate result of Defendants' wrongful actions against him.

**SIXTH CAUSE OF ACTION**
**ASSAULT**
**UNDER CALIFORNIA STATE LAW**
**(PLAINTIFF AGAINST ELIOTT, DOE 1, AND CITY)**

91. Plaintiff realleges and incorporates by reference paragraphs 1 through 90 of this complaint.

92. Defendant Elliott unlawfully placed Mr. Smith in reasonable fear of receiving an imminent violent injury by (1) charging toward him on foot so forcefully that Mr. Smith resorted to running to escape impending violence, and then, (2) in concert with Defendant DOE 1, by

1  continuing to chase Mr. Smith using a police vehicle, and by summoning other police officers and

2  vehicles to join in the chase.

3       93.    As a consequence, Mr. Smith ran himself to exhaustion trying to escape impending

4  violence from Defendants Elliot and DOE 1, eventually vomiting out of stress from their pursuit of

5  him.

6       94.    The conduct of Defendants Elliott and DOE 1 was malicious, wanton, oppressive,

7  and was undertaken with a conscious disregard for Mr. Smith's rights, entitling Mr. Smith to an

8  award of punitive damages against them.

9       95.    Defendant CITY is vicariously liable for the wrongful acts of Defendants Elliott and

10  DOE 1, pursuant to section 815.2(a) of the California Government Code, which provides that a

11  public entity is liable for the injuries caused by its employees within the scope of their employment

12  if their acts would subject them to liability.

### SEVENTH CAUSE OF ACTION
#### BATTERY
#### UNDER CALIFORNIA STATE LAW
#### (PLAINTIFF AGAINST DOES 2-6, CITY)

16       96.    Plaintiff realleges and incorporates by reference paragraphs 1 through 95 of this

17  complaint.

18       97.    At the time and place herein above alleged, Defendants DOEs 2-6 tackled, subdued,

19  and confined Mr. Smith, without probable cause to arrest him and without his consent, thereby

20  causing Mr. Smith severe pain and suffering, apprehension, and emotional distress, placing him in

21  immediate fear for his wellbeing.

22       98.    At the time of his unlawful arrest, Mr. Smith did not offer forcible resistance to his

23  arrest, and did not appear to pose an immediate threat to Defendants DOEs 2-6 or anyone else.

24       99.    Defendants' actions constituted a battery under California law.

25       100.    The conduct of Defendants DOEs 2-6 was malicious, wanton, oppressive, and was

26  undertaken with a conscious disregard for Mr. Smith's rights, entitling Mr. Smith to an award of

27  punitive damages against them.

28

FIRST AMENDED COMPLAINT FOR DAMAGES        No.  24-cv-04691-JSW

101.    Defendant CITY is vicariously liable for the wrongful acts of Defendants DOEs 2-6, pursuant to section 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of their employment if their acts would subject them to liability.

## EIGHTH CAUSE OF ACTION
### FALSE ARREST/FALSE IMPRISONMENT/UNNECESSARY DELAY IN RELEASE UNDER CALIFORNIA STATE LAW
### (PLAINTIFF AGAINST ALL DEFENDANTS)

102.    Plaintiff realleges and incorporates by reference paragraphs 1 through 101 of this complaint.

103.    Arrested without a warrant or probable cause, Mr. Smith was wrongfully committed to solitary confinement in the Berkeley Police Department jail for several hours by Defendants.

104.    Defendants continued to confine Mr. Smith, without his consent, far beyond the time they took to book him for the misdemeanor violations with which they charged him, in clear contravention of California law and published Berkeley Policy Department policy.

105.    Cal. Penal Code § 853.6(a)(1) requires that a person arrested without a warrant and charged only with misdemeanors such as Mr. Smith was be cited and released, unless he demands to be taken before a magistrate. Mr. Smith made no such demand, yet was taken into custody and held for hours after his booking was complete. Moreover, Berkeley Police Department Policy 411.2 states, "It is the policy of the Berkeley Police Department to release all persons arrested on misdemeanor or other qualifying charges on a citation with certain exceptions," as specified in § 853.6. (https://berkeleyca.gov/sites/default/files/documents/RELEASE_20220613_T124840_Berkeley_PD _Policy_Manual.pdf%206%2029%2022.pdf).

106.    Mr. Smith fell under none of the exceptions recognized in § 853.6. That the unnecessary delay in releasing Mr. Smith was a departure from Berkeley Police Department practice was further confirmed by Officer DOE 7, who told Ms. Riggs in his conversation with her about Mr. Smith that it was atypical for the department to hold a misdemeanor arrestee after booking.

107. Defendants' decision to hold Mr. Smith beyond his booking for misdemeanor charges instead of citing and releasing him in accordance with their legal obligations to do so was yet another in a series of retaliatory actions for the statements Smith had made to Officer Elliott.

108. That retaliation was set to continue its course upon Mr. Smith's impending transfer to the Santa Rita Jail in Dublin. There, he would have been held for days, pending a review of his detention by a magistrate. What ultimately saved Smith from that fate was not the law and policies Berkeley police were required to observe, but…his mother, who personally importuned police for his release. As Officer DOE 9 admitted in acceding to Ms. Riggs's request for his release, the department could cite and then release Mr. Smith as a personal favor to her, but for no other reason.

109. The conduct of Defendants in arresting and confining Mr. Smith was malicious, wanton, oppressive, and was undertaken with a conscious disregard for Mr. Smith's rights, entitling Mr. Smith to an award of punitive damages against them.

110. Defendant CITY is vicariously liable for the wrongful acts of all other Defendants, pursuant to section 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of their employment if their acts would subject them to liability.

## JURY DEMAND

Plaintiff hereby demands a jury trial in this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief, as follows:

1.  For general damages according to proof;

2.  For special damages, including but not limited to, past, present and/or future

3.  For punitive damages against the individual Defendants in amounts to be proven at trial;

4.  For any and all permissible statutory damages;

5.  For reasonable costs of this suit, and attorneys' fees pursuant to 42 U.S.C. § 1988, California Civil Code § 52, and California Code of Civil Procedure § 1021.5; and

6.  For such further other relief as the Court may deem just, proper, and appropriate.

DATED: 8/30/2024

 _/s/ James T. Smith_
JAMES T. SMITH
Attorney for Plaintiff